[719 NYS2d 44]

Haim Joseph, Appellant, v Mark Whitcombe et al., Respondents.

First Department, January 11, 2001

### APPEARANCES OF COUNSEL

*Lee S. Wiederkehr* of counsel, White Plains (*Jerry F. Kebrdle,. II* on the brief; *DelBello Donnellan Weingarten Tartaglia Wise & Wiederkehr, L. L. P.,* attorneys), for appellant.

*Elizabeth Shollenberger* of counsel, Bronx (*Bronx Legal Services, Office of the Elderly,* attorney), for respondents.

### OPINION OF THE COURT

TOM, J.

This case involves application of the common law of adverse possession. Defendants husband and wife claim to have adversely possessed the premises at 98 Ditmars Street in the City Island part of the Bronx, since 1982. This is a small bungalow-type structure near a waterfront location. Defendant Mark Whitcombe had been a City Island resident since about 1956 and was familiar with Ditmars Street since he had been a child. By 1982, Whitcombe, who was having difficulty with a landlord, noticed that the house on 98 Ditmars Street appeared to be empty and overgrown and believed it to be abandoned. Apparently intent on remaining on City Island, they relocated from their former address to 98 Ditmars Street "out of sheer desperation," concededly without permission and without a concern that they might be trespassing. By this time, they had a child. Mark Whitcombe did not consider them to be trespassing insofar as the next door neighbor seemed happy that they were cleaning up the property. In fact, since "almost every household [on City Island] has some of my art work," he received "no hostile feedback" to his occupancy of the premises at all. Defendants are artists.

When the defendants moved into 98 Ditmars Street, they believed, that the owner was one Mrs. Mulford, insofar as the site was known locally as one of the "Mulford lots." At some point in time, they heard that the Mulfords had sold the house to friends of a friend of theirs, and decided to "just sit here."

After moving in, defendants installed the artist's studio which was advertised by a sign on the lawn, directed their mail to that address, installed a telephone and electrical service, and made various improvements to the structure of the house. In effect, and to this extent, they acted openly as though they owned the house, an appearance they kept up for the better part of two decades. However, they paid neither real estate taxes nor gas bills, passing them on to a friend who was supposed to pass them on to the actual owner.

The next significant event in terms of ownership was when Crystal Waterview Corp. acquired the property in 1998 at a mortgage foreclosure sale and subsequently sent notice to defendants to terminate their occupancy. In 1999, plaintiff purchased the property from Waterview and shortly thereafter commenced the present ejectment action. In their answer, defendants denied the allegation that they did not own the property, and asserted by way of counterclaim that they had acquired the property by adverse possession. In alleging ownership by adverse possession, they generally alleged that their occupancy since 1982 had been adverse and hostile to any purported owner and was under claim of right.

In moving for summary judgment, plaintiff relied on, *inter alia*, defendants' failure to properly plead entry under a claim of right. Defendants' affidavit and counsel's affirmation in opposition admitted as much, acknowledging that the Whitcombes did not enter under a claim of right, but that their subsequent maintenance of and improvements to the property ripened into a valid claim of ownership. In her affidavit, defendant Elizabeth Whitcombe specifically asserted that their ownership arose from their lengthy possession coupled with "the work we have put into both the house and the property." Mark Whitcombe, in his deposition testimony, further explained "I've always felt it was mine * * * here's my point of view. Every house next to me * * * is a floodplain. Nobody really in their right mind is going to walk into a perfectly lovely neighborhood and just walk into a building and say this is mine, but when it's so overgrown and so awful and it floods so much that I thought to a certain extent it's a fairly heroic effort to try and reclaim a place to live out of this place that floods up to [three inches] from your floor * * * and it's notoriously dangerous to simply be living there. So the very fact that I was living there I felt that it's mine." Although he claimed to know nothing about "squatter's rights," he acknowledged that, in effect, he was a squatter.

The issue under review, then, is whether pursuant to the doctrine of adverse possession, mere occupancy for an extended period of years coupled with open conduct consistent with ownership, but absent an initial claim of right, may ripen into an ownership interest by virtue of the occupancy. The IAS Court found sufficient unresolved issues of fact to deny summary judgment to plaintiff without, however, clarifying what factual issues were unresolved regarding the defendants' concession that they had not entered upon a claim of right.

Adverse possession is an ancient doctrine rooted in English common law, though codified over time in English and American statutory law (Tiffany, Real Property § 1133, at 693 [3d ed]), that was intended for the "settlement and repose of titles" under historical circumstances where questions of title were often contested (Tiffany, *id.*, § 1134, at 698). Although some variation in the elements required might have been found among jurisdictions, basically the possession, to be adverse, had to be actual, open and notorious, hostile, exclusive, and continuous (Cunningham, Stoebuck & Whitman, Property § 11.7, at 808 [2d ed]). Although some commentators have criticized the additional element that the possession must be undertaken under claim of right (*id.*, at 812), nevertheless the element of claim of right, discussed *infra*, became enshrined in much common-law jurisprudence and in modern law codes.

Historically, imposing what, in effect, was a limitations period on potential conflicts over title served the community purpose of ensuring the security of property titles and to prevent "the making of illegal claims after the evidence necessary to defeat them has been lost" (Tiffany, *id.*, § 1134, at 698). It also served and still serves the purposes of stabilizing uncertain boundaries over a period of time, protecting parties acting with or taking from the adverse possessor in reliance on the apparent ownership, and ensuring the continuing productivity of the land (Cunningham, Stoebuck & Whitman, Property, *id.*, at 814). The underlying purpose, then, was stability and regularity rather than rewarding unlawful possession. Defendants' argument is essentially an equitable one, but historically, "there are no equities favoring the establishment of a claim by adverse possession" (Tiffany, *id.*, § 1134, at 698).

Since adverse possession was a means of cutting off legal claims to title, it has historically been strictly applied in the sense that all constituent elements must be proved, with the burden resting on the adverse claimant, with the adverse possessor's acts construed against him, and every inference in favor of a possession that is subordinate to the title of the true owner (Tiffany, *id.*, § 1144, at 766).

In New York, we apply the traditional rule that the possession must be " 'hostile and under a claim of right, actual, open and notorious, exclusive and continuous' " (*Ray v Beacon Hudson Mtn. Corp.*, 88 NY2d 154, 159, quoting *Brand v Prince*, 35 NY2d 634, 636; *Nazarian v Pascale*, 225 AD2d 381, 382; RPAPL art 5), described as essentially the type of possession "that would give the owner a cause of action in ejectment

against the occupier throughout the prescriptive period" (*Brand, supra,* at 636; *Ray, supra*) which is 10 years (*Jennings v Fisher,* 258 AD2d 722). The Real Property Actions and Proceedings Law sets forth statutory requirements in addition to the common-law requirements, regarding whether the adverse possessor claims title under a written instrument (RPAPL 511, 512) or under a claim of title not written (RPAPL 521, 522). The claim of right may arise from ancestral ownership of a residence, though not passed by written instrument, coupled with continuous occupancy and incidents of ownership, such as keeping out intruders and paying taxes (*Ray, supra*), or when the adverse possessor is title owner of the adjacent parcel, whose original boundaries extended to the disputed parcel (*Brand, supra*) or whose use of the disputed structure derived from prior ownership (*Nazarian, supra*). However, mere license to use the property from a prior owner does not ripen into title by adverse possession (*cf., Nazarian, supra*). Since New York law has long disfavored the acquisition of title by adverse possession (*Belotti v Bickhardt,* 228 NY 296, 308), its elements must be proved by clear and convincing evidence (*Ray, supra*).

The modern system of registering titles has largely displaced instances of adverse possession, but the doctrine, nevertheless, occasionally arises in New York where boundaries or the ownership of rural lots have remained imprecise over a period of years. The present case, in which an urban lot, improved by a residential dwelling in a community occupied by a population that seems to be more settled than transient, and where people tend to know who owns what property, is unusual in that defendants managed to live, rent free, as long as they had in the subject dwelling. Not so unusual, though, is that they did not do so adversely, at least insofar as the doctrine of adverse possession has been traditionally understood and applied. Defendants are essentially squatters, albeit squatters who exercised some care for the house that sheltered them.

In his deposition testimony, Mark Whitcombe conceded that when they moved in, they did so with no right to title and acknowledged the rightful ownership of the premises in various third parties. Aside from alleging that they had landscaped the grounds and made improvements, they failed to specify the basis of their claim of right. By thus relying on their activities after commencing occupancy, which relate rather to the adverse and hostile nature of the occupancy, defendants misunderstood the fundamental requisites of entering under a

claim of right, necessarily relating to circumstances predating and contemporaneous with the initial act of occupancy. Moreover, the exclusive nature of the occupancy alleged in the answer does not ripen into a claim of right existing at the time of the initial occupancy.

The adverse possessor's intention upon entering was a permissive factor considered by common-law courts in determining adverse possession rights (Tiffany, *supra*, at 791), though the element of subjectivity has been abandoned in many jurisdictions (*see*, Cunningham, *supra*, at 812, criticizing reliance on the subjective intent of the possessor; *Nazarian v Pascale*, *supra*, noting that New York rejects the need to inquire into the adverse possessor's intent). Although not dispositive under New York law, it also seems clear that defendants entered with no greater intention than that of enjoying, in effect, a free tenancy. Again viewed historically, a "squatter * * * one who, while in possession of another's land, admits that the title is in another person, even though without knowledge of such person's identity," is not adverse for purposes of the doctrine (Tiffany, *id.*, § 1149, at 805). Hence, here defendants were neither sufficiently adverse *ab initio* nor occupying the premises under the requisite claim of right.

Notwithstanding defendants' subjective intent to retain possession adversely as owners, they entered merely as expectant licensees, whose expectations had no objective basis in fact, and their subsequent possession does not even rise to the level of license. Never having had possessory rights, they may not now enjoy ownership rights. At best, they entered as, and remained as, squatters and have acquired rights no greater than those afforded squatters.

Accordingly, the order of the Supreme Court, Bronx County (Barry Salman, J.), entered April 26, 2000, insofar as it denied plaintiff's motion for summary judgment, should be reversed, on the law, without costs, the motion granted, the counterclaim dismissed and the matter remanded for further proceedings.

ROSENBERGER, J. P., WALLACH, RUBIN and SAXE, JJ., concur.

Order, Supreme Court, Bronx County, entered April 26, 2000, insofar as it denied plaintiff's motion for summary judgment, reversed, on the law, without costs, the motion granted, the counterclaim dismissed and the matter remanded for further proceedings.